### BORDEN CO., et al v. MILK COMMISSION (No. 2).
### No. 15685.
Circuit Court, Leon County.

August 12, 1958.

Bedell & Bedell and Loftin & Wahl, all of Jacksonville, for plaintiffs.

Clayton, Arnow, Duncan & Johnston, Gainesville, for defendants.

Scruby & Yonge, Orange Park, for intervenors.

BEN C. WILLIS, Circuit Judge.

This cause came on for hearing on the motion of the defendants for a summary final decree on the issues presented by plaintiffs' complaint and defendants' answer and also came on for hearing on the motion of the defendants for a summary final decree on the issues presented by the counterclaim of the defendants and the answer to the counterclaim by the plaintiffs, and argument of counsel for the respective parties having been heard on these matters and also on the matters presented by other pleadings in this cause, and briefs submitted, and the court being advised of its opinion in the premises, it is thereupon ordered, adjudged and decreed—

This cause originated as a suit for declaratory decree brought in behalf of the several plaintiffs against the defendants as and constituting the Florida Milk Commission, and against the commission as an instrumentality of the state of Florida. Injunctive and other equitable relief was also sought. To the complaint the defendants filed an answer which included a counterclaim against the several plaintiffs. Subsequent to the filing of the answer and counterclaim, the intervenors, above named in the caption, filed their petition to intervene, which was granted by the court. Thereupon the intervenors filed their answer. By stipulation of all the parties, subsequent to filing, it was agreed that the plaintiffs, Albert Skaff, Moses Skaff, Charley Skaff, and Mitchell Skaff, trading and doing business as Skaff & Sons Dairy, a partnership,

be dismissed from this action and from the counterclaim, without prejudice. Pursuant to the stipulation this court, on January 21, 1958, entered its order that this action and the counterclaim thereto be dismissed as to the said plaintiffs without prejudice, and it was also ordered that the said plaintiffs be removed from the operation and effect of the order on temporary injunction entered in this cause on December 23, 1957.

The mentioned temporary injunction was entered by this court on December 23, 1957 following a hearing on application by the plaintiffs for a temporary injunction against the defendants and on application of the defendants for a temporary injunction against the plaintiffs. The said temporary restraining order enjoined both plaintiffs and defendants in certain particulars.

The plaintiffs' reply to the defendants' counterclaim asserts several defenses including the defense that the counterclaim fails to state a cause of action, which was designated as the first defense. The second defense to the counterclaim challenges the power and authority of the defendant commission to compel the plaintiffs to accept delivery of and pay fixed minimum prices for all the milk produced and tendered to them by their producers, regardless of the needs or desires of the plaintiffs. The third defense asserts that none of the plaintiffs is, or at the time of the filing of the complaint herein was contractually obligated to its producers to accept delivery from such producers of milk in excess of class I requirements and to pay for same at minimum prices fixed by the commission. The fourth defense asserts that the plaintiffs had given their respective producers reasonable advance notice that they would not accept certain quantities of milk. The fifth defense denies the authority of the defendant commission to seek and obtain injunctive aid against the plaintiffs. To these defenses the defendants have interposed certain motions to strike, but the points of law raised by said motions will be dealt with otherwise and it will not be necessary to specifically rule upon said motions.

This case involves the power of the defendant commission to fix the prices of class II and class III milk, which classes are sometimes referred to as "surplus milk." It also involves the powers of the commission with respect to relationships between distributors and producers of milk particularly with reference to the imposition or enforcement of obligations on the part of the distributors to accept and pay for such surplus milk. Declarations of rights pursuant to chapter 87, Florida Statutes, are sought in certain particulars, and the respondent commission has sought the injunctive processes of this court specifically conferred in chapter

501, Florida Statutes. The intervenors' contentions are substantially the same as those of the defendant commission but with the added element of an asserted estoppel, which they say should be invoked against the plaintiffs.

This case is to be considered in connection with cases nos. 8891 and 8887, in which this court on July 9, 1958 entered its final orders in certiorari proceedings. In those cases this court had before it the validity of the price fixing orders of the commission and also a certain base fixing order of the commission. The validity of those orders of the commission were under direct attack and each of the orders was upheld as valid. This court dealt fully with the issues of the validity of said orders in those cases and set forth at length the court's opinion on those features. Reference accordingly is made to each of the orders of this court entered in each of the mentioned cases, and what was said therein will not be repeated here except to the extent necessary. However, by such reference it is to be deemed that the court is incorporating herein all that was there said which is applicable in this case.

The plaintiffs are licensed milk distributors in the state. The defendant commission by its official orders numbered TB-6, CF-8, NE-8, 9 and 11, all dated November 30, 1957, to be effective January 1, 1958, set forth the fixed prices to be paid by distributors and producer-distributors to producers for milk in the several milk marketing areas of the state. These orders fixed prices for not only class I milk but also for class II and class III milk. Previous to these orders, there were no prices fixed for classes II and III. These orders grew out of a public hearing conducted by the defendant commission in October, 1957, but were not promulgated until after the further hearing in November of that year. It appears that at the October meeting the commission had voted to fix prices of class II milk at 43c per gallon and for class III at 30c per gallon, to be effective December 1, 1957. However, official orders were not promulgated on these prices, and following the November meeting, pursuant to action there taken, the above mentioned orders were promulgated which provided that the minimum price for class II milk is 43c per gallon to the extent of that portion of the class II milk equal to 5% of the class I milk. The remainder of the class II milk was to be paid for at minimum prices based on what is known as the Miami formula. The minimum price for class III milk is fixed at 26c in this order.

Following the October meeting, but before the November meeting, certain of the plaintiffs issued notices to their producers, the gist of which, in general, was that the plaintiffs would not accept

all of the milk which the producers delivered. In some instances it was said that they would not accept milk beyond class I needs and in other instances deliveries would be limited in other ways. The plaintiffs claim that the defendant commission has made threats to revoke licenses or to take other disciplinary action against distributors who refuse to accept all milk delivered by their producers and to pay the commission fixed prices for same.

In brief, the pleadings set forth two general issues. The first is that the action of the commission in fixing the prices is invalid and that the commission has no power to require distributors to accept and pay fixed prices for milk they neither want nor need. The other issue is that presented by the counterclaim of the defendants which asserts that the proposed action of the plaintiffs in curtailing the acceptance of milk delivered to them by their producers in accordance with a previous course of dealing without reasonable advance notice and reasonable cause would constitute violations of chapter 501, Florida Statutes, which may be prevented by the injunctive processes of this court.

As previously mentioned, the official orders of the respondent commission which fixed prices to be paid for all classes of milk including classes II and III have been upheld as valid and reasonable orders. Also since the filing of this chancery proceeding, the defendant commission has promulgated its order no. 20-11 which sets forth a base fixing procedure to be followed by producers and distributors. This order has also been upheld as valid. The question whether or not the plaintiff distributors may be compelled by action of the commission to accept all milk delivered to them by their producers and to pay fixed prices for same is posed here. Necessarily that question requires consideration of both the price fixing and the base fixing orders above mentioned. It is to be observed that the base fixing order does not impose an inflexible requirement on the acceptance of milk from the producer by the distributor. It provides a procedure to establish contractual relations between the producers and the distributors and recognizes certain contractual obligations which have arisen by virtue of a previous course of dealing. However, the order does provide that the distributor may, with commission approval, reject milk offered when there is "just cause" for same. Thus there is afforded a distributor a means of avoiding an undue and unconscionable hardship on it when there is "just cause" for not accepting milk tendered. It cannot be presumed that the commission will abuse its powers or otherwise act arbitrarily in permitting or denying a variation from the normal course of accepting all milk and paying the minimum prices fixed for same.

It is incumbent upon this court to accord to the plaintiffs a declaration of rights on the matters which have been properly raised in this proceeding. Accordingly, the following declarations are made.

The question is presented as to whether F. S. chapter 501 confers power on the commission to require distributors and producer-distributors subject to its jurisdiction to accept any part or all of the milk produced and delivered to them by their producers, including milk which the distributors and producer-distributors neither need nor want and to pay for such milk minimum prices fixed by the commission. The commission does have the power to require distributors and producer-distributors to accept and pay. for milk in accordance with the price fixing and base fixing orders, provided of course, the commission acts reasonably in doing so under the particular circumstances that may be involved. This power applies to all classes of milk and not only milk utilized in class I channels only. Such power and authority is not affected by the amount of milk delivered and accepted during a base setting period except to the extent that, as in all of the circumstances, such power must be reasonably exercised. There is also power and authority to prohibit and prevent distributors and producer-distributors from limiting the amounts of the deliveries by the producers during the base setting periods, provided, again, such power is reasonably exercised.

Order no. 20-11, referred to as the base fixing order, was promulgated January 16, 1958. This order sets forth a uniform method by which the producers establish contractual relationships with their distributors and producer-distributors. It provides for base fixing periods in each of the milk marketing areas commencing in 1958. In the Central Florida, Northeast and Tallahassee areas the base fixing period begins September 1, 1958, and in the Tampa Bay area it begins November 1, 1958. During these periods bases are established between the producers and the distributors which shall be construed as binding contracts in full force and effect from the first day of the second month following the end of the base fixing period until the first day of the second month following the end of the next ensuing base fixing period, unless terminated in accordance with the provisions of order no. 20-7 (the so called "just cause" order). Order no. 20-11 further provides that unless terminated in accordance with the provisions of official. order no. 20-7, "all existing bases and relationships between producers and distributors or producer-distributors shall remain in full force and effect until the first day of the second month following the end of the first base fixing period provided in paragraph 2." Pur-

suant to this all existing bases and previous courses of dealing entered into by the producers and distributors and which were in effect at the time official order no. 20-11 went into effect were to continue until the subsequent base fixing procedures were accomplished.

The written and oral notices given by the plaintiffs to their respective producers, as set forth in the plaintiffs' complaint, do not constitute a justification of the plaintiffs to reject milk delivered by or on behalf of their producers, particularly in view of the construction which this court places upon F. S. 501.09 (3) (a). The last mentioned statutory provisions state further that the commission may revoke the license of a milk dealer who has "rejected without reasonable cause or reasonable advance notice, milk delivered by or in behalf of a producer in ordinary continuance of a previous course of dealing except where contract has been lawfully terminated." The plaintiffs have contended that this should be construed as authorizing rejection if a dealer has given reasonable advance notice *or* there is reasonable cause for same. The defendants contend that there must be both reasonable advance notice and reasonable cause for such rejection. The actual difference between the opposing contentions is more apparent than real. Approaching a construction that the conjunction "or" is to be construed strictly in the disjunctive, that rejection may be made either with reasonable advance notice or for reasonable cause, there would still be the necessity of determining whether the cause or the notice was reasonable. If the asserted ground was reasonable notice, the reasonableness of the notice necessarily would involve the circumstances of both the producer and distributor. Thus it would be necessary to consider why there should be an alteration of the previous course of dealing and this would involve the nature of the cause of such alteration. On the other hand, if the asserted ground is reasonable cause, the nature of the cause and the time of termination would involve proper notices to both parties. In effect, it appears to have been the intention of the legislature that the parties once having established a course of dealing would continue in such relationship and the acceptance by the distributor of all milk delivered until such time as this course of dealing should be terminated or modified under the circumstances and in a manner that is reasonable and fair to both parties. This would seem to fit in precisely with the "just cause" provision of the base fixing order. A few examples will perhaps be illustrative. Distributor D and producer P have established a course of dealing whereby P delivers all of his milk to D who accepts same and pays for it accordingly. D, in good faith, determines to make extensive alterations of his plant which will necessitate a shut down of re-

ceiving milk for a period of several months. D, in good faith in carrying out these plans, will not have receiving or storage facilities for this milk. He gives P notice that commencing six months from the date of the notice he cannot take any more of his milk for the reasons above mentioned. There would thus appear to have been both reasonable cause and reasonable advance notice and under these circumstances P could either curtail his production or undertake to find another dealer. However, with the same situation as above, if D only gave P one week's notice, it would be unreasonable to terminate or modify the course of dealing in so short a time. However, if D should sustain a fire loss which destroyed his receiving and storage facilities, 24 hours or less notice would be reasonable.

Now, suppose that D decides that because of an actual conflict of personality between him and P which has produced unpleasant relations so that D just doesn't want to do business with P any longer, he gives six months notice that the previous course of dealing would be terminated at the end of that period, it might well be considered that there was both just cause and reasonable notice to terminate the relationship. On the other hand, suppose that P is known to enjoy an occasional movie, but D's plant manager has such an aversion to the whole motion picture industry that he doesn't like to deal with anybody who even goes to a motion picture. Such a reason or cause for termination would be arbitrary and capricious and no amount of notice would justify termination of a previous course of dealing for any such frivolous reason. By the same token, if the fanaticism were reversed, P could not terminate his relationship regardless of the amount of notice given.

It is therefore concluded that the notices given by the plaintiffs to their producers fall short of showing on their face that they constitute reasonable cause or reasonable advance notice for rejecting class II and II milk.

Prior to the price fixing orders, the "previous course of dealing" existing between the plaintiffs and their producers included the acceptance of all milk produced and delivered by their producers and the plaintiffs paid class I prices for such proportions of the milk as was utilized for class I purposes and for the remainder they paid a price determined by, and presumably satisfactory to, each of the respective plaintiffs. However, said "previous course of dealing" provided that for all milk produced and delivered by the producer in excess of his proportionate share of that used in class I channels, the producer was entitled to be paid prices based on the going market price for butterfats and serum solids used in manufacturing milk products. Under such previous course of

dealing, the distributor did not have the right to arbitrarily determine what prices should be paid for classes II and III milk but was obligated to pay prices fairly based on the going market price of such butterfats and serum solids.

The provisions of chapter 501, Florida Statutes, which grant to the commission power and authority to require distributors and producer-distributors to accept milk from their producers, including classes II and III milk, and pay fixed minimum prices therefor, do not deprive plaintiffs of their liberty of contract, or their property without due process of law in violation of section 12 of the declaration of rights of the constitution of Florida, or the 5th and 14th amendments to the constitution of the United States. The provisions of the statute contemplate the reasonable exercise of the mentioned power, and the statute and orders pursuant thereto reasonably applied do not violate any of the above mentioned constitutional provisions and further do not offend the commerce clause of the United States constitution. With regard to the commerce clause, the plaintiffs assert that the action of the commission in promulgating its price fixing orders would force or have the effect to require the plaintiffs to buy Florida milk for their manufacturing purposes and prevent plaintiffs from importing and using milk or milk ingredients from without the state in lieu of Florida milk for such purposes and thus would set up an economic barrier to protect the Florida local milk supply against competition from without the state, irrespective of economic considerations. There is no foundation for any such conclusion. The price fixing orders are not shown in any way to restrain or restrict the plaintiffs from buying any milk or milk products they desire from out of the state and paying whatever prices they see fit. The base fixing order and other orders of the commission involved in this case do not burden or discriminate against interstate commerce. I find no violation of the constitutional rights.

In view of all the proceedings that have taken place with regard to the construction of the powers of the defendant commission and the effect and reasonableness of the orders it has promulgated, it does not appear that the extraordinary injunctive powers of this court need to be further exercised in this proceeding. This court will not presume that the commission will act arbitrarily or capriciously in the enforcement of its orders and neither will the court presume that the distributors will violate the orders now that they have been upheld. Inasmuch as the notices which the distributors have given to their producers were given some eight or nine months ago and prior to the actual effectiveness of the price fixing and the base fixing orders and before this court's ruling on the validity of those orders, this court will presume that

such notices have now become obsolete. It will further be presumed that the distributors will, in their dealings with their producers, follow the procedures set forth in the applicable orders of the commission and otherwise proceed in a lawful manner.

Accordingly, it is ordered, adjudged and decreed that the temporary injunction set forth in the order of this court dated December 23, 1957 be and the same is hereby dissolved; and the plaintiffs' prayer for a permanent injunction against the defendants is denied, and the defendants' prayer for a permanent injunction against the plaintiffs is denied, for the reason that it does not clearly appear at this time that the plaintiffs are threatening or intend to violate any provisions of the law or any valid orders of the commission. The costs of this suit shall be assessed against the plaintiffs.

It appears that there is no genuine issue of any material fact involved in this case and, therefore, there is no impediment in proceeding to the entry of a summary final decree in this cause.